CAPITAL CITY EXCAVATING CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Capital City Excavating Co. v. Commissioner
Docket No. 7368-81.
United States Tax Court
T.C. Memo 1984-193; 1984 Tax Ct. Memo LEXIS 477; 47 T.C.M. (CCH) 1527; T.C.M. (RIA) 84193; 5 Employee Benefits Cas. (BNA) 1641; April 18, 1984. Steven D. Rowe and Stephen A. Moyer, for the petitioner. Larry L. Nameroff, for the respondent. HAMBLEN
*480 MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in excise tax under section 4975(a) [1] as follows: Year
Amount
1975
$1,500.00
1976
1,500.00
In his answer to the petition in the instant case, respondent determined additional deficiencies in excise tax under section 4975(b) as follows: Year
Amount
1975
$30,000.00
1976
30,000.00
After concessions, the primary issue for determination is whether the sale of certain shares of stock by petitioner to an employee stock ownership plan ("ESOP") constituted a prohibited transaction under section 4975(c)(1)(A), thereby rendering petitioner liable for the excise tax imposed by section 4975(a). In the event that this issue is determined adversely to petitioner, we must further decide whether petitioner is liable for the additional excise tax imposed by section 4975(b). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits *481 thereto are incorporated herein by this reference.
Petitioner is a corporation which had its principal place of business in Columbus, Ohio, when it filed its petition in this case. Petitioner is a contractor and subcontractor, engaged in the business of excavating, digging, grading, and heavy construction. Petitioner's business involves subdivision work, streets, waterlines, and storm sewers. The business includes both private and public sector work. The public sector work component grew in proportion since 1971, and it constituted about 40 percent of petitioner's business by 1975. Petitioner obtains contracts by bidding on open tenders and through individual negotiation. Petitioner is a closely-held corporation. Its shares are not listed on any public stock exchange nor traded over the counter. Prior to 1975, petitioner had issued a total of 1,297 shares [2] of stock. Of these shares, 865 were outstanding and 432 were treasury shares for two years prior to the transactions relevant to the current controversy. All shares were of a single class of common stock with a par value of $100.00 per share. *482 In December of 1975, petitioner retired its treasury shares, changed its capital structure, and made a stock split. The articles of incorporation were amended, deleting par value stock and adding two classes of common stock without par value. Petitioner was authorized to issue up to 8,000 shares of Class AA voting common stock and up to 3,000 shares of Class A nonvoting common stock. Petitioner exchanged 5,184 Class AA voting shares for the 865 outstanding shares of par value stock, effecting a 6-for-1 split. On December 31, 1975, petitioner merged with Central Excavating, Inc. ("Central"), a corporation owned by the same shareholders as petitioner and in the business of owning dump trucks used in petitioner's business. Petitioner was the surviving corporation in the merger. Petitioner exchanged 725 Class AA voting shares for the shares of Central. At the time of the merger, Central had total assets worth $58,069.08 and a net worth of $56,071.80. Petitioner increased its retained earnings by $49,247.00 as a result of the merger. By its action by written consent dated December 31, 1975, ("the action"), petitioner's directors authorized the issuance of various shares of common *483 stock at the price of $100.00 per share. A total of 97 Class AA shares were authorized for sale to six directors and key employees. These sales, which did not occur until 1976, were voluntary on the part of the purchasers. The action also authorized the issuance of 1,000 Class A shares to the Capital City Excavating Co., Inc. Employee Stock Ownership Trust ("the ESOP"). The total purchase price of $100,000.00 for these shares was paid to petitioner by the ESOP. The ESOP had been established by the adoption of an ESOP plan on September 26, 1975. On July 16, 1976, the District Director of the Internal Revenue Service had issued a determination letter holding that the ESOP qualified for exemption from taxation under sections 401 and 501. [3]
Petitioner's books showed the following financial information for the five years preceding the sale of shares of stock to the ESOP: 1975
1974
1973
1972
1971
Shares outstanding [4]
5,909
5,190
5,190
7,140
6,792
Net worth
$525,799
$371,708
$314,325
322,118
$283,127
Book value per share
88.98
71.62
60.56
45.11
41.69
Net after tax income
(loss)
(8,634)
82,407
80,452
39,414
44,056
Earnings (loss) per
share
[5] ( 1.46)
15.88
15.50
5.52
6.49
*484 The sale price of $100.00 per share was determined by Ralph Walls ("Walls") late in 1975.Walls was petitioner's treasurer, one of its directors, and among the purchasers of the 97 Class AA shares. [6] He was also a trustee of the ESOP. Walls calculated the price by taking the 1974 operating results and net worth from the balance sheets of petitioner and Central. To these figures, he added projected results on the basis of more than ten months of figures then available for 1975. Walls recognized that the value of fixed assets was understated on petitioner's books due to the use of accelerated depreciation methods for tax purposes. [7] To reflect this fact, he adjusted the 1975 projected figures to reflect depreciation consistent with actual value. Total value was divided by the number of outstanding shares, yielding a per share value of $111.92. On the basis of this valuation, the purchase price was set at $100.00 per share. *485 In his notice of deficiency, respondent disagreed with the value of $100.00 per share.Respondent determined a value of only $70.00 per share. Under respondent's determination, the shares were sold by petitioner to the ESOP for more than adequate consideration, thus constituting a prohibited transaction and subjecting petitioner to liability for excise tax. At trial, both parties presented expert witnesses as to the value of the shares. Petitioner's expert was a Certified Public Accountant who had performed an audit on petitioner's 1975 financial statement. He attempted to reconstruct petitioner's net asset value by revaluing certain construction equipment by reference to figures shown in the Green Guide for Construction Equipment ("Green Guide") for 1975. He also revalued land and improvements owned by petitioner on the basis of values supplied by an outside appraiser and a savings and loan association. By this method, petitioner's expert determined a per share stock value of $151.40. He further determined that the net value as stated in petitioner's books should return a profit of 12 percent per annum, and that all earnings in excess of this percentage were attributable *486 to the intangible asset of goodwill. He then capitalized earnings attributable to goodwill at a rate of 15 percent per annum, took an average for such figures for 1971 to 1975, and added the result to net book value as of the end of 1975. By this method, he determined a per share stock value of $164.08. He then averaged the two tentative determinations of $151.40 and $164.08, discounted that result by 10 percent to reflect a lack of marketability of the shares purchased by the ESOP, and reached the final determination that the shares were worth $142.00 each. Respondent's expert was a financial analyst in the Valuation Analysis Section of the Internal Revenue Service. He disagreed both with petitioner's methodology and with its result. Respondent valued the stock at $70.00 per share on the basis of comparing petitioner to five separate comparable corporations whose stock was publicly traded. Respondent's expert testified that he was unable to locate any comparable companies whose stock was traded on an exchange; however, shares of the entities used for comparison were publicly traded over the counter. In making his comparisons, respondent's expert used a method of statistical *487 analysis known as regression analysis. He allowed no adjustment for intangible assets such as goodwill or going-concern value, and he took no discount for lack of marketability of shares. OPINION Section 4975(a) provides: * * * There is hereby imposed a tax on each prohibited transaction. The rate of tax shall be equal to 5 percent of the amount involved with respect to the prohibited transaction for each year (or part thereof) in the taxable period. The tax imposed by this subsection shall be paid by any disqualified person who participates in the prohibited transaction (other than a fiduciary acting only as such). The so-called second-tier tax of 100 percent of the amount involved is imposed in circumstances wherein the initial tax of section 4975 (a) is imposed and "the transaction is not corrected within the correction period." [8] Sec. 4975(b). Both sections 4975(a) and 4975(b) require that a "prohibited transaction" occur. It is undisputed that the sale of stock by petitioner to the ESOP *488 was a prohibited transaction. [9] However, section 4975(d) provides a number of exemptions for transactions to which the prohibitions of section 4975(a) shall not apply. Of relevance to the instant case is section 4975(d)(13), which exempts "* * * any transaction which is exempt from section 406 of [the Employee Retirement Income Security Act of 1974 ("ERISA")] [10] by reason of section 408(e) of [ERISA] * * *." These ERISA sections provide that a fiduciary of a plan shall not cause the plan to engage in certain transactions, including sales between the plan and a party in interest, including an employer.[11] However, an exception is made for specified transactions, including the sale of employer securities for adequate consideration. [12] Adequate consideration is "* * * the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary [of Labor]." [13] Sec. 3(18), ERISA. *489 In sum, these various statutory rules require that, in order to avoid the imposition of tax under section 4975(a), petitioner must show that its sale of shares to the ESOP was an exampted transaction under section 4975(d)(13), with reference to sections 406 and 408, ERISA. To do so, petitioner must demonstrate that the sale was for adequate consideration within the meaning of section 3(18), ERISA. Adequate consideration, as defined, requires not only that the purchase price reflect fair market value, but also that the process by which the price was set conform to established standards of fiduciary care. Fiduciary standards require protection of the interests of plan participants and their beneficiaries. See sec. 2(b), ERISA. This protection must be balanced against a competing consideration, however, because Congress has adopted a policy of fostering the use of ESOPs.See Donovan v. Cunningham,716 F.2d 1455, 1466 at n.23 (5th Cir. 1983). The report of the joint conference committee at the time of the enactment of ERISA clearly states this need for balance: The conferees expect that the courts will interpret this prudent man rule (and the other fiduciary *490 standards) bearing in mind the special nature and purpose of employee benefit plans. [Conf. Rept. No. 93-1280, 1974-3 C.B. 415,463.] In the instant case, we must determine whether adequate consideration was paid by the ESOP to petitioner; i.e., whether the fair market value of the stock was at least $100.00 per share, [14] and whether the process used by Walls in determining the price conformed to established fiduciary standards. Fair market value is traditionally defined as "* * * the price at which the property *491 would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." United States v. Cartwright,411 U.S. 546, 551 (1973). Where shares are publicly traded, actual sales provide the surest record of price, and hence of value. See secs. 20.2031-2(b) and (f), Estate Tax Regs. [15] Even where stocks are unlisted, actual sales may be available to determine value. As this Court stated in Duncan Industries,Inc. v. Commissioner,73 T.C. 266, 276 (1979), citing Estate of Fitts v. Commissioner,237 F.2d 729 (8th Cir. 1956): In determining the value of unlisted stocks, actual sales made in reasonable amounts at arm's length, in the normal course of business within a reasonable time before or after the valuation date are the best criteria of market value. In cases of closely-held corporations, however, there may be no reliable history of actual sales. Thus, shares must be valued on the basis of what willing buyers and *492 willing sellers would be likely to pay or to accept in hypothetical sales. The regulations provide that where selling prices or bid and asked prices are not available, then fair market value is to be determined by taking into account net worth, prospective earning power, dividend-paying capacity, and "other relevant factors." Sec. 20.2031-2(f), Estate Tax Regs.; sec. 25-2512-2(f), Gift Tax Regs. Under these regulations, "other relevant factors" may include: * * * the good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. * * * Rev. Rul. 59-60, 1959-1 C.B. 237, [16] echoes these factors and discusses the significance to be attached to each of them. It also provides for the use of profit-and-loss statements for the five year period ending with the valuation date.
*493 The regulations and Rev. Rul. 59-60 provide a framework within which valuation may be attempted. Valuation is not an exact science, however, and the process will vary depending on the facts and circumstances of particular cases. [17] In the case now before us, Walls closely followed the parameters of Rev. Rul. 59-60 in determining the price of shares. He considered various factors suggested by the ruling, and he offered reasons for adjustments made to those factors. For example, the increase in net worth taken over book value was explained by the need to adjust for the use of accelerated methods of depreciation used by petitioner. *494 Respondent disputes the efficacy of petitioner's valuation methods.For example, respondent allows no adjustment for goodwill or going-concern value. It is true that much of petitioner's business was obtained through bidding on open tenders, a process in which goodwill or business reputation might to be a factor. However, other contracts were negotiated, and goodwill would be a factor in the success of obtaining these clients. Rev. Rul. 59-60 specifically cites goodwill as a factor to be considered. Under the circumstances, we find the intangible assets of petitioner did have value, and the adjustment taken therefor was warranted in theory and reasonable in amount. Respondent urges us to adopt the comparable sales method of valuation used by his expert. This method is an accepted practice of valuation and is, in fact, mentioned in Rev. Rul. 59-60. It is, however, only one of many factors to be used in valuing property and is not, in and of itself, determinative of value. Furthermore, the comparable sales approach is always subject to attack on the ground that considered properties were not truly "comparable" for various reasons. In the instant case, *495 petitioner challenges the corporations selected for comparison by respondent's expert in several respects. Petitioner notes that various of the entities compared: were different from petitioner in scope and type of business activities; were larger than petitioner in many respects; had vastly larger numbers of shares outstanding than did petitioner; operated over a broader geographich range than did petitioner; had less attractive dividend-paying histories and capacities than did petitioner; had experienced performance and growth declines while petitioner had expanded; and, unlike petitioner, were members of consolidated groups or conglomerates, or were parents of one or more subsidiary corporations. Furthermore, none of the companies used for comparison were listed on any exchange, thus requiring subjective assertions as to the value of the comparables to be made before comparison can occur. Rev. Rul. 59-60, supra at section 4.02(h), expresses a clear preference for listed stocks over over-the-counter stocks as a source of comparison for valuation purposes. We have considered such objections by petitioner and, while not without flaws, we find they have some merit. *496 In any event, the comparable sales data relied on by respondent is not so persuasive as to rebut the evidence of value set forth by petitioner. Petitioner's explanations of both price and methodology are reasonable under the circumstances. Most importantly, they are buttressed by the fact of simultaneous sales at $100.00 per share to six directors and key employees of petitioner. It is true that these sales, while not compulsory, are not arm's-length transactions in that they are sales to insiders who might be in a position to influence price. This fact cuts against respondent's own position, however: insider sales are normally suspect in that prices may be artificially low in deference to officers, directors, or key employees; the perceived danger in the instant case is just the opposite, i.e., that the price paid by the ESOP was too high. It is irrational to suggest that the lack of arm's-length bargaining in this instance worked to the disadvantage of the ESOP. If it had any influence at all, it would only have been to decrease the price which the ESOP paid to petitioner. Finally, we note that the 1,000 shares purchased by the ESOP were Class A nonvoting shares, *497 while the 97 shares purchased by others were Class AA voting shares. Although not stressed by either party to this case, we believe this distinction should be considered in valuing the shares purchased by the ESOP. The valuation of shares by Walls and the subsequent opinion rendered by petitioner's expert both fail to take account of this qualitative difference between the two classes of stock. Although not expressed, it may be that this factor was considered in assessing the marketability of the shares. The nonvoting feature of the Class A shares arguably makes them less attractive to potential buyers, and hence less marketable. It is well-established that a discount to value to reflect lack of marketability is proper. No such discount is authorized in the applicable regulations or in Rev. Rul. 59-60. However, common practice, as approved in case law, permits such discount. [18] Respondent's expert took no deduction for lack of marketability, finding the need for such adjustment was offset by competing factors such as petitioner's favorable dividend-paying history and capacity. On the other hand, petitioner's expert discounted his tentative valuation of $151.40 *498 per share by 10 percent to reflect a lack of marketability. We conclude that, even if some discount for the nonvoting feature of the Class A shares is appropriate, it was included by petitioner in the discount taken for lack of marketability and, in any event, the appropriate discount for nonvoting shares would not be so large as to reduce the valuation estimate of $151.40 below $100.00. For the reasons discussed, we hold that the price of $100.00 per share for stock purchased by the ESOP from petitioner constituted adequate consideration. Furthermore, we hold that the process used by petitioner in setting that price was reasonable and conformed to fiduciary standards. We recognize that additional steps, such as employment by petitioner of an outside appraiser prior to this controversy, might have aided the valuation process and ameliorated the need for litigation. Nonetheless, we do not find that petitioner's methods were impermissible nor that the price of $100.00 per share was unreflective of fair market value. *499 Having found that the fair market value of the stock was at least $100.00 per share, there is no need to establish exact valuation. [19] It is sufficient for purposes of this case to conclude that there is no "amount involved" in a "prohibited transaction," because the $100,000.00 paid by the ESOP falls within the exemption to 4975(a) set forth in section 4975(d)(13), i.e., the transfer for adequate consideration examption. Where petitioner has no liability for the initial tax of section 4975(a), there can be no additional tax imposed by section 4975(b). We have considered respondent's other arguments, and we find them unpersuasive. To reflect the foregoing, Decision will be entered for the petitioner.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
2. The accountant's financial report for 1971 inexplicably reflects a total of 1,278 shares of stock issued. However, this discrepancy does not affect our opinion herein.↩
3. Section 401 sets forth the requirements for qualification of a trust in connection with pension, profit-sharing, and stock bonus plans. Section 501 exempts certain qualified trusts and organizations from taxation.↩
4. Actual number of shares outstanding at year end after adjusting for the 6-for-1 stock split. ↩
5. Calculated after the sale of shares to the ESOP.↩
6. Walls purchased 7 of the 97 Class AA shares. ↩
7. Petitioner depreciated new assets by the double-declining balance method; used assets were depreciated based on one and one-half times the rate allowed by the straight-line method of depreciation.↩
8. Unless and until there is a finding of liability for the tax imposed by sec. 4975(a), there is no need to discuss the intracacies of the requirements of sec. 4975(b).↩
9. Sec. 4975(c)(1)(A) defines "prohibited transaction" to include any direct or indirect "sale or exchange, or leasing, of any property between a plan and a disqualified person;" sec. 4975(e)(2)(C) includes "an employer any of whose employees are covered by the plan" as a "disqualified person." Thus, the "sale" of shares by petitioner, a "disqualified person," to the ESOP constitutes a "prohibited transaction." ↩
10. Pub.L. 93-406, 88 Stat. 829 (1974), 29 U.S.C. sec. 1001 et seq.↩
11. sec. 406, ERISA, provides in relevant part: (a) Except as provided in section 408: (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect -- (A) sale or exchange, or leasing, of any property between the plan and a party in interest; * * *. ↩
12. Sec. 408, ERISA, provides in relevant part: (e) Sections 406 and 407 shall not apply to the acquisition or sale by a plan of qualifying employer securities (as defined in section 407(d)(5)) * * * (1) if such acquisition, sale, or lease is for adequate consideration * * *. Sec. 408(e) further requires that no commission be charged and that the plan is an eligible individual account plan, as defined in sec. 407(d)(3). However, as respondent has raised no issue regarding these requirements, our analysis here is limited to the requirement of adequate consideration. ↩
13. To date, no regulations have been promulgated under sec. 3(18), ERISA.↩
14. Since a sale for less↩ than adequate consideration on the part of the ESOP would not contravene the purpose of ERISA, i.e., protection of plan participants and their beneficiaries, a fair market value in excess of $100.00 per share would presumably not violate sec. 408(e), ERISA. Therefore, it is not necessary that we determine the actual value of the shares, so long as that value is shown to equal or exceed the purchase price. In the event that value of at least $100.00 per share is not proved by petitioner, then determination of exact value will be necessary in order to compute the "amount involved" on which tax is imposed under sec. 4975(a).
15. see also Watts, The Fair Market Value of Actively Traded Securities, 30 Tax Lawyer 51, 52-57↩ (1976).
16. Modified by Rev. Rul. 65-193, 1965-2 C.B. 370, and amplified by Rev. Rul. 77-287, 1977-2 C.B. 319, Rev. Rul. 80-213, 1980-2 C.B. 102, and Rev. Rul. 83-120, 1983-33 I.R.B. 8↩.
17. See, e.g., Est. of Andrews v. Commissioner,79 T.C. 938, 945 (1982), wherein this Court stated: "* * * courts should not restrict consideration to only one approach to valuation, such as capitalization of earnings or net asset values." Compare, e.g. Sirloin Stockade, Inc. v. Commissioner,T.C. Memo. 1980-303, in which we considered book value as "* * * an inadequate measure of value," with Fedders Corp. & Subs. v. Commissioner,T.C. Memo 1979, 350, affd. without published opinion, 659 F.2d 1066↩ (3d Cir. 1981), in which book value was found to constitute the best evidence of fair market value under the circumstances.
18. See, e.g., Estate of Andrews v. Commissioner,supra note 16; Estate of O'Connell v. Commissioner,T.C. Memo. 1978-191↩.
19. See supra note 14.↩