**Thomas COSGROVE, et al., Plaintiffs,**

v.

**CIRCLE K CORPORATION, et al., Defendants.**

**No. CV 89-321 TUC JMR.**

United States District Court,
D. Arizona.

Dec. 23, 1994.

Erik M. O'Dowd, O'Dowd, Burke & Lundquist, P.C. Tucson, AZ, for plaintiffs.

Streich Lang, P.A. by Susan Boswell and Craig Kaufman, Tucson, AZ, for defendant Circle K.

Lillick & Charles by D. Ward Kallstrom and Randall S. Farrimond, San Francisco, CA, for defendant Fred Hervey.

Pettit & Martin by Thomas P. Burke and Daniel Weisberg, Los Angeles, CA, for defendants Karl and Joan Eller.

ROLL, District Judge.

Plaintiffs Cosgrove, et al. are members of the Fred Hervey Interests Employees' Benefits Plan (the Plan), a pension plan created by Circle K. This class action alleges that Circle K and trustees of the Plan engaged in a prohibited transaction when Circle K acquired the Plan's interest in certain property. The Court has under advisement plaintiffs' motion for partial summary judgment regarding (1) whether the sale constituted a prohibited transaction, and (2) the burden of proof thereon. Also under advisement is defendants' cross-motion regarding adequacy of the consideration. For the reasons set forth below, the Court grants plaintiffs' motion for partial summary judgment regarding burden of proof and denies both plaintiffs' motion for partial summary judgment re-

garding the sale constituting a prohibited transaction and defendants' cross-motion for summary judgment regarding adequacy of consideration.

## THE PLAN

The Plan was formed in December 1946, amended in December 1975 to conform to the Employee Retirement Income Security Act (ERISA), and again amended in December 1985. In 1986, Circle K decided to terminate the Plan.[1]

Following the 1985 Plan amendments, the Plan had three trustees, Fred Hervey, the Chairman of the Board of Sun World Corp., Vice–Chairman of the Board of Circle K and a principal shareholder,[2] Robert Hutchinson, the president of Circle K and a board member, and Millard Orick, the President of Sun World. Sun World was an affiliate of Circle K. The plan administrator was Brent Foshie.

Among the assets of the Plan in 1986 was an interest in 91 properties. The Plan's interest in 79 of the 91 properties was acquired in 1973. That year, the Plan paid $1,000 to acquire an expectancy in land on which 79 stores were located. As a result of a sale/leaseback transaction with Circle K, First Circle Properties, Inc. ("First Circle") became the owner of these 79 stores subject to a mortgage in favor of Massachusetts Mutual Life Insurance Co. ("Mass Mutual") and Circle K's lease, which had fixed rental payments of $523,962 yearly for 25 years. The Plan exercised an option in that deal, buying the properties for $1000 and leasing them back to First Circle for $100 a year for 25 years. The Plan had the right to receive rental payments on the ground lease from First Circle in the amount of $100 annually until October 30, 1998, at which time Mass Mutual's mortgage was scheduled to be paid in full. At that time the Plan was scheduled to succeed to First Circle's interest in the properties and from then until October 30, 2013, if Circle K exercised its options in extending the lease, the Plan had the right to receive the lease payments of $523,962 yearly. As of October 30, 2013, the Plan was scheduled to own an unencumbered fee simple interest in all 79 properties.

The Plan's other 12 properties were acquired in other transactions and, in 1986, the Plan owned these 12 stores outright, subject to leases with Circle K.

## PRELUDE TO SALE

Once Circle K decided to terminate the Plan, funding of the Plan ended and it was necessary to sell the Plan's assets and distribute the proceeds to participants.[3]

On January 29, 1986, Karl Eller, the chief executive officer of Circle K, initiated an inquiry regarding Circle K buying the Plan's interests in the 91 stores. Eller approached the three Plan trustees regarding a possible sale.

The Plan trustees, in order to sell the Plan's assets at fair market value, needed an appraisal. Wendell L. Montandon was retained by Circle K to appraise the Plan's assets. Montandon was familiar with the assets as a result of his 1984 appraisal of the Plan's assets.

In 1986, Circle K received an opinion from attorney Robert Zaboroski that Circle K's purchase of the Plan's interest in the 91 stores would not be a prohibited transaction

---

1. Circle K's decision to terminate the Plan is a business decision which is not subject to ERISA's fiduciary responsibility rules. *See, e.g., Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1162 (3rd Cir.1990).

2. A principal shareholder owns or is beneficiary of at least 10 percent of any class of a corporation's stock. 15 U.S.C. § 78p.

3. Defendant Fred Hervey argues that once the decision to terminate was made, the trustees were under a legal obligation to liquidate and distribute the assets "as soon as administratively feasible," citing to 26 C.F.R. § 1.416–1, T–4 and

Rev.Rul. 89–87 (announcing a presumption that distributions taking longer than one year are not as soon as administratively feasible). The cited authority deal with requirements for a terminating plan to receive favorable tax treatment, including an end to certain reporting requirements. To the extent that it is shown the trustees were acting in order to minimize tax liability, the Court will weigh that as a factor going to the ultimate question of good faith; however, the Court declines to accept the proposition that the trustees were under an absolute obligation to liquidate plan assets within one year.

under ERISA if Circle K paid fair market value and the Plan paid no commission on the sale.

### MONTANDON APPRAISAL

Montandon is a member of the American Institute of Real Estate Appraisers, with over twenty years of real estate appraisal experience.

Pursuant to a settlement agreement in a previous action[4] brought against Circle K for alleged breach of ERISA fiduciary obligations in 1984, Montandon appraised all 91 stores in which the Plan had an interest. At that time, all parties to the action had agreed upon Montandon to conduct the appraisal.

In March 1986, Circle K retained Montandon to appraise the Plan's interests in the 91 stores. Circle K did this in anticipation of Circle K's acquisition of the Plan's interests in the 91 stores. This appraisal was updated in October 1986 and was relied upon by the Plan's trustees in deciding the asking price for the stores.

In July 1986, Montandon appraised the fair market value of the Plan's interest in the 79 stores at $2,500,000 and in the 12 other stores to be $1,808,700. In October 1986 at Circle K's request, Montandon updated these appraisals and concluded that the Plan's interest in the 79 stores had increased by $50,000 to $2,550,000 and in the other 12 stores by $35,000 to $1,843,700.

Because of the trustees' reliance upon Montandon's appraisal, it is necessary to consider the methodology utilized.

#### Methodology of 1986 Appraisal

Montandon, in his 1986 appraisal, considered rental payments to be paid the Plan until October 1998. The payments totalled only $100 per year. He also took into account the rental payments scheduled to commence October 1998 and to cease October 2013. These anticipated payments consisted of $6,632.43 per store per year. Finally, Montandon considered the Plan's reversionary rights in the 79 stores effective 2013. He was mindful of the fact that Circle K was the

most logical purchaser of the Plan's 91 stores when the Plan had to liquidate its assets.

Montandon requested and received information regarding previous Circle K sale/leaseback transactions but was furnished no details regarding Circle K's potential sale/leaseback agreement with Robert Kathary and RAK Development Co. (Kathary II Agreement). Montandon did consider the likelihood that should Circle K acquire the Plan's stores, they would be the subject of some future sale/leaseback transaction.

As to the Plan's 79 reversionary rights stores, Montandon's appraisal assumed that (1) it was "highly probable" that the favorable lease terms under which Circle K paid $551 per store per month (this represented the yearly rent of $6,632.43 per store per year) would be extended to 2013; (2) the only interest the Plan would have in the stores from 1998 to 2013 would be the right to collect increased rent; and (3) the Plan would not receive "reversionary rights in the fee simple estates of the 79 properties" until 2013. In preparing his October 1986 update, once again Montandon was not made aware of the pending Kathary II Agreement.

### CIRCLE K'S PURCHASE FROM THE PLAN

On October 21, 1986, Circle K paid the Plan $4,393,700 for all 91 stores in which the Plan had an interest, $2,550,000 of which is attributable to the 79 stores in which the Plan enjoyed reversionary rights. This purchase price was exactly the fair market value placed upon the property in Montandon's October 1986 appraisal.

### KATHARY II AGREEMENT

While Circle K was seeking to purchase the Plan's 91 stores, it was negotiating the Kathary II sale/leaseback agreement.

On October 14, 1986, Circle K entered what it describes as a "non-binding purchase agreement." The formal agreement was entered April 28, 1987.

Under the terms of the October 14, 1986, Kathary II Agreement, Circle K agreed to

---

4. *Bret v. Hervey,* No. CIV 82–747 TUC RMB.

sell 250 stores, including 75 of the 79 stores in which the Plan had possessed reversionary interests. Circle K was to be paid $100 million for the 250 stores, and agreed to lease the stores back at an initial average rent of $39,000 per store per year, up from Circle K's payments of $6,632.43 per store per year under the previous arrangement with First Circle, Mass Mutual, and the Plan.

## ERISA

The Employee Retirement Income Security Act prohibits a fiduciary from engaging in a sale, lease or exchange of Plan property between the Plan and a party in interest. 29 U.S.C. § 1106.[5] Circle K, as fiduciary of the Plan and employer of the Plan's participants, constitutes a party in interest. 29 U.S.C. § 1002(14)(A) and (C).

Administrative and statutory exceptions apply to this general prohibition, however. The parties agree that the only potential exception having application to this transaction is a statutory exception contained in 29 U.S.C. § 1108(e). That exception permits otherwise prohibited transactions "if such acquisition, sale or lease is for adequate consideration ...," no commission is charged, and the Plan is an individual account plan. *Id.* The parties disagree as to whether Circle K paid adequate consideration to the Plan. If Circle K did not pay adequate consideration, the Plan's sale of its assets was a prohibited transaction.

Adequate consideration is defined as fair market value as determined in good faith. 29 U.S.C. § 1002(18)(B). "Fair market value in the context of fiduciary breaches in ERISA cases has been defined as 'the price that a willing buyer would pay a willing seller, both having reasonable knowledge of

the pertinent facts.' " *Reich v. Valley Nat'l Bank,* 837 F.Supp. 1259, 1283 (S.D.N.Y.1993) (quoting *Sommers Drug Stores v. Corrigan Enterprises, Inc.,* 793 F.2d 1456, 1461 (5th Cir.1986) *cert. den'd,* 479 U.S. 1089, 107 S.Ct. 1298, 94 L.Ed.2d 154 (1987)). An analysis of adequate consideration calls for an objective standard. *Id.; Capital City Excavating Co. v. Commissioner,* 47 T.C.M. (CCH) 1527, 5 E.B.C. 1641, 1984 WL 14447 (1984) (reasonable valuation means objectively reasonable.)

The fiduciary defendants maintain that the good faith requirement of ERISA required that they use a prudent method of determining value. *Donovan v. Cunningham,* 716 F.2d 1455, 1474 (5th Cir.1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984). Proper reliance on an independent appraisal is strong evidence of a prudent investigation. *Id.* Plaintiffs argue that the Plan fiduciaries did nothing but slavishly follow an obviously flawed appraisal.

## VALIDITY OF MONTANDON APPRAISAL

Plaintiffs maintain that an upward adjustment in the income stream value was appropriate in light of Circle K's interest in the Plan's property. They argue that Montandon's assumptions regarding the probable timetable for the Plan's realization of benefits from its interests in the 79 properties were inaccurate and known to be inaccurate by Circle K, the party retaining Montandon. Plaintiffs also contend that Circle K's unique interests in these stores constituted a factor which should have driven the value of the Plan's interests upward.[6] In support of this assertion, plaintiffs' tender opinions by two expert witnesses that Montandon's appraisal was defective. Plaintiffs offer the following

---

**5.** As applicable to this matter, 29 U.S.C. § 1106 provides:

§ 1106. Prohibited transactions

  (a) Transactions between plan and party in interest

Except as provided in section 1108 of this title:

  (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

    (A) sale or exchange, or leasing, of any property between the plan and a party in interest[.]

**6.** In a memorandum decision setting aside a district judge's entry of summary judgment in favor of Circle K previously entered in this case, the Ninth Circuit states:

  [Montandon's] appraisal purported to be based upon an income stream theory which did not necessarily account for the unique value that the Plan's interest might have to Circle K itself. *Cosgrove v. Circle K,* Nos. 90–15881 and 90–15965, 1991 WL 184805 at * 1 (9th Cir. Sept. 19, 1991).

analogy. They compare the enhanced value attributable to Circle K's coveting of the Plan's interest to a situation in which a seller owns property worth $10,000 but which is identical in size and value to three adjacent parcels which the buyer already owns. Should the buyer succeed in obtaining the seller's parcel, the buyer will sell the four parcels as an assembled unit for $100,000. The buyer's opportunity to reap a windfall from adding the seller's parcel to the other three parcels greatly enhances the value of the seller's parcel.

Circle K counters that the Plan's property interests in the 79 properties were drastically improved by Circle K paying off the mortgages on the property and removing other encumbrances. Circle K then added 75 of the 79 properties to 175 other stores owned by Circle K. Defendants' counter-analogy is that Circle K bought pieces of an Edsel from the Plan and sold a completed Lamborghini in the Kathary II Agreement. Accordingly, the profit realized by Circle K is largely not attributable to the Plan's interests.

The experts proffered by the respective parties have conflicting opinions as to what weight should have been given to the Kathary II Agreement by Montandon and even as to whether the agreement was relevant at all.

### EXTENT OF CIRCLE K'S ENRICHMENT FROM PLAN'S PROPERTIES

Pursuant to the Kathary II Agreement, Circle K received $400,000 per store for each of the 75 stores in which the Plan previously had an interest, or a total of $22,000,000.

The Plan was paid $2,550,000 for its interest in these 75 stores and four others.

Defendants vehemently maintain that they did not profit $19,450,000 at the expense of the Plan. Defendants point out that in addition to the $2,550,000 paid the Plan, in order for Circle K to convey the 75 stores, it had to pay Mass Mutual $4,097,364.34 in connection

with mortgages on those stores and pay an additional $250,000 to First Circle for its property interests in the 79 stores. Accordingly, Circle K spent a total of $6,897,363 to acquire the unencumbered fee simple interests in these 75 stores (and four others) conveyed in the Kathary II Agreement.

Circle K then conveyed these 75 stores as part of a much larger package of 250 stores. Defendants argue that a key component of that transaction was Circle K's agreement to lease back the 250 stores at an initial average rent of $39,000 per store per year, up from the average rent of $6,632 per store per year. In addition, Circle K assumed other significant obligations as part of the Kathary II Agreement.

Plaintiffs maintain that the Plan's interests in the 75 properties was essential for the Kathary II Agreement. They further argue that Circle K's desire to acquire these stores greatly enhanced the value of the Plan's interests. In this contention, the Plan has support from the Ninth Circuit.[7]

### SUMMARY JUDGMENT

■ A party is entitled to summary judgment if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. In ascertaining whether a genuine issue of fact exists, the Court must view all of the evidence in the light most favorable to the non-movant as well as all reasonable inferences drawn from that evidence. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

"The function of the Court in considering [a] motion for summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried." *Rattner v. Netburn*, 930 F.2d 204, 209 (2nd Cir.1991). Valuation of the Plan's interests in the 75 stores ultimately transferred by Circle K in the Kathary II transaction presents a genuine issue of fact.

---

7. *See supra* note 4. The Ninth Circuit also observed:

It takes no economics hierophant to realize that when one person has something another

dearly wants, the other may have to pay dearly for it.

*Cosgrove v. Circle K Corp., supra,* at * 2, 3 n. 3.

*Cf. Propstra v. United States,* 680 F.2d 1248, 1251 (9th Cir.1982).

Defendants maintain that fair market value is arrived at by ascertaining what a willing buyer will pay a willing seller, neither acting under compulsion. *See e.g.* Black's Law Dictionary, p. 597 (6th ed. 1990). They maintain that fair market value is an objective standard, dealing with hypothetical willing buyer and willing seller. *Propstra,* 680 F.2d at 1251–2 (assessment of federal estates taxes). However, in reversing the previous entry of summary judgment in this matter, the Ninth Circuit explicitly discussed Circle K's desire for the Plan's interests in these stores as a factor affecting fair market value. *Cosgrove, supra,* at pp. 1250–51. This is the law of the case.[8]

While the facts are largely not in dispute, the inferences that reasonably could be drawn therefrom are. Whether adequate consideration was paid to the Plan by Circle K will largely hinge upon whether Montandon's appraisal was adequate. On that, the experts disagree. The issue of adequate consideration is inappropriate for summary judgment.

*TRUSTEES' CONDUCT—GOOD FAITH*

■ A second issue raised by plaintiffs deals with the good faith of the trustees in agreeing on the price at which the Plan's interests in the stores were to be sold. Plaintiffs maintain that the trustees did nothing more than slavishly adhere to a patently defective appraisal.

Plaintiffs maintain that defendants did not obtain fair market value for the property as determined in good faith because the trustees did not scrutinize Montandon's appraisal report, Montandon was retained by Circle K, the appraisal report failed to consider the existence of the pending Circle K sale and leaseback Kathary II Agreement, failed to maximize profit for the Plan, and failed to consider that the market included a highly motivated buyer. The issue of the trustees' good faith is inextricably linked to Montandon's appraisal.

8. "[T]he decision of the circuit court must be followed in all subsequent proceedings in the same case under the law of the case. [citation

The fact that each trustee also had an interest in Circle K does not mean that their decision to sell was per se improper. *See e.g., Donovan,* 716 F.2d at 1473; *Lynch v. J.P. Stevens & Co.,* 758 F.Supp. 976, 999 (D.N.J.1991). Congress specifically permitted Plan fiduciaries to have divided loyalties in situations governed by ERISA. 29 U.S.C. § 1108(c)(3); *Donovan,* 716 F.2d at 1466. Furthermore, in arriving at the valuation of a plan's assets, fiduciaries may rely upon independent appraisals. *Id.,* 716 F.2d at 1474.

Defendants argue that the trustees reviewed and discussed the appraisal, obtained legal advice, then determined that the appraisal reflected fair market value.

At oral argument, defendant Circle K put great emphasis on the outstanding return on investment the sale of the Plan's assets generated. From a $1,000 investment in 1973, the Plan received $2,550,000 in 1986, constituting a 255,000 percent rate of return in 13 years. This argument implies that such bounty should shield the fiduciaries from liability even absent a showing of good faith. The Court in *Reich* rejected a similar argument.

Rather, the focus of the Court's inquiry on the issue of adequate consideration remains on the reasonableness of the fiduciaries' conduct in arriving at a selling price for the Plan's assets. Certainly the rate of return secured by the transaction at issue is a factor to be weighed in this analysis. It is not dispositive, however.

The trustees followed Montandon's appraisal. The record reflects no independent evaluation. Robert Hutchinson, one of the Plan's three trustees, testified at deposition that the trustees accepted and relied upon Montandon's appraisal. The Plan's interests were sold to Circle K for the precise figure mentioned in the appraisal. The Court cannot say as a matter of law that the fiduciaries' acceptance of Montandon's valuation fulfilled their duties under ERISA.

omitted]." *Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400, 1404 (9th Cir.1993), *cert. den'd,* —— U.S. ——, 114 S.Ct. 64, 126 L.Ed.2d 34 (1993).

Whether Circle K's acquisition of the Plan's interest was for fair market value as determined in good faith presents facts from which conflicting inferences can reasonably be drawn. Summary judgment as to whether this constituted a prohibited transaction because fair market value was not arrived at in good faith must be denied.

IT IS ORDERED as follows:

1. That plaintiffs' motion for summary judgment on burden of proof is GRANTED.

2. That plaintiffs' motion for summary judgment on prohibited transaction is DENIED.

3. That defendants' cross-motion for summary judgment on adequacy of consideration is DENIED.