Gary L. EYLER, Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 95–2482.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 6, 1996.

Decided July 2, 1996.

Thomas A. Brodnik (argued), Stark, Doninger & Smith, Indianapolis, IN, James C. McKinley, Richard A. Kempf, Kempf & McKinley, Indianapolis, IN, for Petitioner–Appellant.

Gary R. Allen, Linda Mosakowski (argued), Dept. of Justice, Tax Division, Appellate Section, Washington, DC, for Respondent–Appellee.

Before ESCHBACH, KANNE, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Gary Eyler, the former CEO and majority shareholder of Continental Training Services, Inc. (CTS), disputes excise taxes assessed

against him by the Commissioner of Internal Revenue in 1992. The Commissioner determined that Eyler, as the majority owner of CTS stock, engaged in a prohibited transaction with CTS's employee stock ownership plan (ESOP) when he sold $10 million worth of CTS stock to the ESOP in December 1986.

Eyler appealed the Commissioner's determination to the Tax Court. After a 1995 trial, the Tax Court concluded that Eyler was not exempt from liability for excise taxes imposed in connection with his sale of CTS stock to the ESOP because he failed to establish: (1) that the fair market value per share of CTS stock on the transaction date was at least $14.50 per share; or (2) that any fiduciary named in the ESOP made a good-faith determination that the fair market value per share of CTS stock on the transaction date was at least $14.50.

■■■ Eyler appeals the Tax Court's decision and we have jurisdiction under 26 U.S.C. § 7482(a). We apply the same standards of review to a Tax Court decision that we would apply to district court determinations in a civil bench trial: We review questions of law *de novo*; we review factual determinations, as well as application of legal principles to those factual determinations, for clear error. *Estate of Whittle v. Commissioner*, 994 F.2d 379, 381 (7th Cir.1993). Although the record may contain conflicting evidence on some points, we note that the Tax Court's role, as the finder of fact, is "[t]o draw inferences, to weigh the evidence, and to declare the result." *Helvering v. National Grocery Co.*, 304 U.S. 282, 294, 58 S.Ct. 932, 938, 82 L.Ed. 1346, *reh'g denied*, 305 U.S. 669, 59 S.Ct. 56, 83 L.Ed. 434 (1938). And, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

The Internal Revenue Code imposes a two-tier excise tax on prohibited transactions between an ESOP and disqualified persons. 26 U.S.C. § 4975(a) and (b). A prohibited transaction includes any sale of stock between a plan and a disqualified person, and a disqualified person is an owner of 50 percent or more of the stock of a corporation whose

employees are covered by the plan. §§ 4975(c)(1)(A), 4975(e)(2)(E). Section 4975(a) imposes a yearly 5–percent tax on the amount involved. Section 4975(b) imposes a second tier of tax equal to 100 percent of the amount involved if the prohibited transaction is not corrected (i.e., reversed) within the taxable period. Eyler was assessed on both tiers.

Since 1973, when Eyler started CTS, he was its sole or majority shareholder as well as its chairman of the board and chief executive officer. CTS operated a series of vocational schools to train truck drivers and heavy equipment operators. Government deregulation of the industry resulted in enormous growth for CTS. Enrollment at CTS schools surged from about 2,000 students in 1980 to more than 37,000 students in 1986. At one time, CTS employed 900 people; it was the largest proprietary vocational training system in the United States. By 1986, the company was even looking to expand to Europe and Canada.

In 1985, as growth of his company really took off, Eyler began exploring either selling CTS or taking it public. CTS received inquiries and solicitations from a number of investment banking firms about going public, merging, or just being sold. In particular, Eyler received an offer from Waste Management Systems in November 1985 to purchase his CTS stock. After discussing the offer with a financial consultant, Bernard Perry of Merrill Lynch (who later became chief financial officer and a director of CTS), and one of CTS's attorneys, Gregory Hahn (who later became general counsel and an officer and director of CTS), Eyler rejected it as inadequate.

In early 1986, Eyler and CTS decided to take the company public through an initial public offering (IPO). Prudential–Bache Securities (Pru–Bache) and Raffensperger, Hughes & Co. were retained by CTS as underwriters in connection with the IPO. From the spring through fall of 1986, Pru–Bache and Raffensperger conducted a due diligence investigation which consisted of reviewing the financial records and history of CTS, visiting the company's facilities, interviewing the management, and evaluating fi-

nancial and economic forecasts. As a result of the investigation, an estimated price range of $13 to $16 per share was established within which the stock of CTS might possibly be offered to the public in the IPO. This estimated price range was not to be binding, and the underwriter was free to market the stock outside of it. The stock would not be sold pursuant to the proposed IPO until a final price, which could have fallen outside the estimated range, was established.

As of August 1, 1986, there were 4,999,950 shares of CTS issued and outstanding, all of which were owned, for practical purposes, by Eyler. Pru–Bache prepared a preliminary prospectus, relying on financial information for CTS for the fiscal year ending June 30, 1986, which was filed with the Securities and Exchange Commission on September 10, 1986. The proposed IPO provided for 2,200,000 shares to be sold to the public—1,450,000 shares from Eyler and 750,000 from CTS. This would increase the total outstanding shares of CTS stock by 750,000 to 5,749,950.

After setting the proposed offering price range of $13 to $16 per share, the underwriters attempted to determine whether there was interest in purchasing CTS stock in the neighborhood of that price. Marketing the proposed IPO to potential purchasers during October and the first week of November 1986, Pru–Bache and Raffensberger determined that the "circle of interest" for CTS stock at $13 to $16 was only around $1 million.

A few words about the IPO market. The market is sensitive and cyclical; timing is crucial. Fluctuations in the market are commonly referred to as the "Wall Street window." When the window is open, the opportunity is ripe for an IPO; when the window is closed, the IPO market is weak. Swings in the IPO market relate either to activity in the overall market or in a particular industry. At the time CTS contemplated its IPO, there was a general decline in the market, closing the window of opportunity. Consequently, in November 1986, CTS, relying upon advice by its underwriters, postponed its IPO. The plan was to wait and hope for improvement in the market.

Meanwhile, in November 1986, Eyler decided to look into establishing an employee stock ownership plan for CTS and thereafter sell a substantial portion of his shares of CTS stock to the ESOP. On November 24, 1986, CTS approached the American Fletcher National Bank to negotiate a $10 million loan to be secured by the shares to be sold to the ESOP by Eyler. CTS's financial consultant, Mr. Perry, handled the negotiations with the bank. Prior to approving the loan, the bank performed a due diligence investigation of CTS and sought two opinion letters from attorneys. First the bank obtained and relied upon a letter which indicated that the proposed loan and ESOP transaction did not violate or constitute a nonexempt prohibited transaction under either the Internal Revenue Code or the Employee Retirement Income Security Act of 1974 (ERISA). The second letter obtained and relied upon showed that CTS had the corporate power to enter into the loan transaction. Neither letter contained any specific opinion or reference to whether the ESOP's purchase of CTS stock was for "adequate consideration" or whether the proposed purchase price of $14.50 constituted fair market value.

At a CTS board meeting on December 12, 1986, Perry explained the current financial statements of CTS and compared them to its financial projections. The IPO was again brought up, but no action taken. Instead, the board turned its attention to the proposed ESOP, the terms of which were presented by Perry. The ESOP included a provision, called a "put option," granting each employee a right to sell CTS stock to the company or the ESOP trustee at fair market value upon distribution of such stock to the employee. The plan further provided that the sale price upon exercise of the option could be paid in annual installments, bearing a reasonable rate of interest, over a maximum of 5 years. Under the terms of the ESOP, CTS was designated plan administrator and named fiduciary. CTS's duties under the plan included appointing and overseeing the plan committee. After discussion and questions concerning the ESOP, the board approved the establishment of the plan under the terms proposed by Perry during the meeting: the ESOP would borrow $10

million from the bank, with the loan guaranteed by CTS; the loan proceeds would be used by the ESOP to purchase 689,655 shares of CTS stock from Eyler; and the purchase price of the stock would be $14.50 per share. Eyler did not participate in the CTS board's discussions or voting concerning the ESOP transaction.

The board named John Bruno plan trustee and also appointed a plan committee consisting of Eyler and four other individuals. The board approved the terms of the loan from the bank and voted for CTS to guarantee the loan. The board also authorized one of the directors to finalize the loan. The loan agreement between the ESOP and the bank, and the term note, were executed on December 22, 1986, under the same terms as negotiated by Perry and approved by the board. The loan was guaranteed by CTS and by Eyler in his individual capacity. As additional security for the loan, Eyler was required to pledge $5 million. This was accomplished by having the bank retain $5 million from the proceeds of the ESOP loan. Thereafter, on December 22, 1986, the ESOP purchased 689,655 shares of CTS stock (about 14 percent of outstanding shares) from Eyler for $14.50 per share, or almost $10 million.

Under an agreement with the bank, CTS was obligated to make contributions to the ESOP in an amount sufficient to cover the loan payments. The loan principal was payable at a rate of $2 million per year, in quarterly installments of $500,000. And just for the period from December 22, 1986, to June 30, 1987, CTS incurred expenses of $1,116,552 as a result of the ESOP. As contributions were made to the ESOP by the company, reducing the ESOP's debt, equivalent amounts would be restored to the shareholders' equity account.

The loan agreement with the bank placed several restrictions on CTS. For example, CTS would be limited in its ability to borrow money or grant liens. Capital expenditures would also be limited, and a dividend moratorium was likely. CTS might also have been able to realize certain benefits from the ESOP. Possible intangible benefits included: improved recruiting, securing good personnel, and benefits from employee ownership of the company. Future payroll increases were also expected to be reduced as a result of the ESOP, and CTS would be able to take tax deductions for the contributions made to the ESOP.

Other events involving CTS relevant to this case are worthy of mention. Sometime in late 1986 or early 1987, seven of the CTS board members each purchased 1,882 shares of CTS stock from John Strakis, the minority shareholder of CTS, at $14.50 per share, for a total purchase price of just over $27,000. One of the directors, Tanner, paid cash for his stock. The remaining six directors received funds for the purchase from Eyler by way of informal, unsecured "bridge loans," the terms of which were not reduced to writing. Eventually, the stock certificates evidencing the directors' purchases were prepared in March 1987, when loans from the bank for the purchase were formally approved.

In addition, at the time the preliminary prospectus was prepared and filed with the SEC by the underwriters in September 1986, two investigations of CTS were pending. The first investigation, by the attorney general of California, concerned allegations that CTS engaged in certain fraudulent practices and used untrue or misleading advertising with respect to its courses. The second, by the United States Department of Education, focused on the same areas of concern. Both investigations were disclosed in the preliminary prospectus.

In 1988, the United States, on behalf of the Department of Education, filed a $366 million lawsuit against CTS. The federal government also withdrew CTS's eligibility to participate in various government student loan programs. This withdrawal was later judicially determined to be a violation of CTS's constitutional right to due process, but by the time this news arrived CTS was financially ruined.

In January 1987, shortly after formation of the ESOP and its purchase of Eyler's stock, CTS considered acquiring an interest in Overland Express, a public trucking company. On February 23, 1987, CTS purchased about 28 percent of the outstanding shares of Over-

land stock for $3,250,000. This purchase proved to be a poor investment, ultimately costing CTS millions of dollars. As of July 1987, CTS had lent Overland almost $3 million.

During 1987, CTS retained Duff & Phelps, Inc. as an independent investment and financial analyst to determine the fair market value of the CTS stock held by the ESOP. In December 1987, Duff & Phelps, Inc. determined that as of June 30, 1987, the fair market value of CTS stock was $10.50 per share. This valuation reflected CTS's investment in Overland and the $9 million debt owed by the ESOP as an obligation of CTS. Not surprisingly, CTS filed for bankruptcy in 1989, and eventually the company was liquidated.

In 1991 the IRS began investigating the ESOP transaction. In April 1992, the Commissioner determined that Eyler was a disqualified person who engaged in a nonexempt prohibited transaction within the meaning of 26 U.S.C. § 4975. Eyler was said to be liable for the excise tax penalty, and a notice of deficiency was issued to him for assessments covering the years 1986 to 1990.

Eyler does not dispute that, as CTS's majority shareholder, he was a disqualified person and that he engaged in a prohibited transaction when he sold his stock to the ESOP. Instead, he filed a petition in Tax Court seeking a redetermination of the deficiency, claiming that the sale was exempt from the prohibited transaction excise tax under I.R.C. § 4975(d)(13). That provision, in effect, provides that a sale of employer-issued securities to an ESOP is not prohibited if the securities are purchased by the ESOP for "adequate consideration." Eyler argued first that the $14.50 price paid by the ESOP for his stock was fair market value. In the alternative, he says, even if $14.50 was not fair market value, CTS's board of directors acted in good faith in determining that it was, and thus "adequate consideration" was still received by the ESOP.

The Tax Court rejected both arguments. First, it held that Eyler failed to meet his burden of establishing $14.50 as the fair market value on the date of the prohibited transaction. The Pru–Bache range of $13 to $16 per share did not, in the court's view, represent a final price determination, and it was also based on a number of assumptions that had not come to pass. Second, the court found that since the board members knew that many of the assumptions underlying the Pru–Bache price range had changed, and yet they did nothing further to investigate the suggested price, their actions did not rise to the level of prudence imposed on ERISA fiduciaries. Since "adequate consideration" was not received by the ESOP when it purchased Eyler's stock, the Tax Court sustained the deficiencies determined by the Commissioner.

The Commissioner has stipulated that if the fair market value of the CTS stock sold to the ESOP is determined to have been at least $14.50 per share, then Eyler will not be liable for the excise taxes imposed by § 4975. Thus, Eyler prevails if he proves either (1) that the fair market value of CTS stock sold to the ESOP was at least $14.50 per share, or (2) that the $14.50 price was determined in good faith by way of a prudent investigation. As we shall see, the Tax Court's determinations on these issues are amply supported by the record and not, therefore, clearly erroneous.

■ We first address Eyler's claim that the fair market value per share of CTS stock on December 22, 1986, was at least $14.50. Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *Estate of Curry v. United States,* 706 F.2d 1424, 1431 (7th Cir.1983) (citing Treas.Reg. § 20.2031–1(b)); *United States v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 1716–17, 36 L.Ed.2d 528 (1973). This requirement has been interpreted repeatedly by the IRS and the courts as requiring that the willing buyer and seller be hypothetical. *Curry,* 706 F.2d at 1431; *Propstra v. United States,* 680 F.2d 1248, 1251–52 (9th Cir.1982). The fair market value is a question of fact reviewable under the "clearly erroneous" standard, and the Commissioner's determination of value is pre-

sumptively correct. *See Zuhone v. Commissioner,* 883 F.2d 1317, 1323 (7th Cir.1989). Therefore, a taxpayer like Eyler has the burden of proving otherwise.

Eyler argued to the Tax Court that the fair market value of CTS stock was at least $14.50 based on the valuation set by Pru–Bache. As noted by the Tax Court, there are several reasons why Pru–Bache's estimated price range of $13 to $16 per share does not establish the fair market value to be at least $14.50 on the date of the sale. First, that price range was established after Pru–Bache conducted a due diligence investigation and as a part of CTS's anticipated IPO. In September 1986, Pru–Bache "currently estimated" the price range at which it though CTS stock would sell on the public market to be $13 to $16 per share. Pru–Bache recommended that as part of its IPO, CTS offer to sell its stock for $14.50 per share. That price range did not purport to determine the fair market value of CTS stock at any specific point in time; nor did it in any way purport to be a final determination. The purpose of selecting that price was to see how investors might respond. Additionally, that price range was not binding and did not represent a firm commitment by the underwriters. Had CTS decided to pursue the IPO, the underwriters could have then determined a final price, which may well have been outside the estimated range.

The lack of public interest in CTS stock also weighs against Eyler's reliance on the Pru–Bache valuation. When the stock was offered nationally to individual and institutional investors, the "circle of interest," that is, investors who may be interested in purchasing stock should the IPO go forward, was small, no more than $1 million. Obviously then the public showed scant interest in buying CTS stock within the Pru–Bache price range. While Eyler argues that this lack of interest was attributable solely to the closing of the IPO window, an inference at least as reasonable is that the stock was overpriced.

█ In addition, as the Tax Court correctly observed, many significant factors changed from the time the prospectus was filed by the underwriters in September to the completion of the ESOP sale on December 22, 1986. Pru–Bache's $13 to $16 estimated price range was based on certain assumptions which did not come to fruition at the time of the ESOP transaction. First, the underwriters assumed that as a result of the IPO, CTS would be a publicly traded corporation. Stocks that are not readily marketable, of course, are generally less valuable than those that can be freely traded. *Estate of O'Connell v. Commissioner,* 640 F.2d 249, 253 (9th Cir.1981). Another important assumption was that the IPO would result in a positive cash flow for CTS. When the IPO was shelved and the ESOP established, CTS's cash flow actually worsened because CTS committed itself to making contributions to the ESOP in amounts large enough for the plan to repay the $10 million loan. This negative cash flow compared to the projected positive cash flow would drive down the value of CTS stock from the estimate in the preliminary prospectus.

Moreover, a significant factor not assumed, let alone considered, by the underwriters in preparing the preliminary prospectus was the establishment of the ESOP itself. *See Donovan v. Cunningham,* 716 F.2d 1455, 1471 (5th Cir.1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984) (underwriter had not assumed that an ESOP existed when it appraised corporation's stock). Upon formation of the ESOP, CTS undertook two obligations that affected its balance sheet and future operating income. First, CTS guaranteed the $10 million loan to the ESOP which was required to be classified as debt on CTS's balance sheet and a charge to shareholders' equity. Second, CTS obligated itself to make contributions to the ESOP in an amount sufficient to cover the loan payments, or at least $2 million per year, resulting in a significant cash drain on the company. Also, as a result of guaranteeing the loan to the ESOP, CTS was subject to several restrictions that the underwriters did not consider. For example, CTS agreed not to distribute dividends until the entire $10 million loan was repaid. CTS was also limited in its ability to borrow money, grant liens, and make capital expenditures. Significant changes in these underlying assump-

tions, together with the limited nature of the Pru–Bache estimated price range and minimal circle of interest, demonstrate that the Pru–Bache valuation did not provide a basis for establishing fair market value.

Eyler contends further that the Tax Court erred when it adopted the Commissioner's argument regarding a marketability discount. A marketability discount reflects the hypothetical buyer's concern that there will not be a ready market available when that buyer decides, in turn, to sell. The Tax Court agreed with the Commissioner that because the Pru–Bache price range assumed a public market, the $14.50 price failed to take into account a discount for lack of marketability. Eyler argues that the discount is inappropriate because of the existence of a put option in the ESOP agreement. Since plan participants could sell their stock and CTS had a history of buying shares whenever they were distributed to plan participants, no marketability discount should apply to the Pru–Bach price because, for the plan participants, there was a ready market to sell the stock. Although appealing, Eyler's argument fails for the fundamental reason that as of the date of the ESOP transaction, CTS had no history of paying ESOP distributions in cash. Whatever effect CTS's history of payouts might have had on the fair market value of CTS stock at the time of the ESOP transaction was pure speculation. Similarly, we reject Eyler's assertion that the marketability discount was inappropriate because the put option had no fixed price and could be paid out over five years under the terms of the ESOP. Nothing in the record convinces us that the Tax Court clearly erred when it concluded that the marketability discount should apply to the Pru–Bache valuation.

▆▆▆▆▆ Eyler also points to the purchases of CTS stock by several directors for $14.50 per share shortly after the ESOP transaction as a basis of establishing fair market value. He contends the best method for determining fair market value of unlisted stocks is by reference to actual sales made in reasonable amounts, at arm's length, in the normal course of business, and within a reasonable time before or after the valuation date. *Duncan Industries, Inc. v. Commis-*

*sioner,* 73 T.C. 266, 1979 WL 3700 (1979) (citing *Fitts' Estate v. Commissioner,* 237 F.2d 729, 731 (8th Cir.1956)). This contention is correct, but it must be kept in mind that the taxpayer bears the burden of demonstrating that the sales were sufficiently at arm's length. Eyler equates his situation with that of *Capital City Excavating Co. v. Commissioner,* 47 T.C.M. 1527 (1984), which held that certain director purchases of the company's stock were sufficiently at arm's length to establish the fair market value of the stock. The Tax Court found Eyler's reliance on *Capital City* misplaced. Although the case does give some comfort to Eyler, we cannot say that the Tax Court unreasonably detected a difference.

In *Capital City,* as in Eyler's case, the IRS determined that deficiencies in excise taxes under § 4975(a) and (b) existed. *Capital City* was a closely held corporation which established an ESOP and sold the ESOP its stock. *Id.* at 1528. *Capital City* argued that its stock was worth $100 per share; the IRS contended that it was worth only $70 per share, thereby subjecting Capital City to the excise tax. In support of its claim that the fair market value of its stock was $100 per share, Capital City pointed to a sale of 97 shares of stock to six of its directors and employees at $100 per share. The $100 price per share was determined by Capital City's treasurer, who was also one of its directors and among the six purchasers of the shares. *Id.* The Tax Court found that "these sales, while not compulsory, are not arm's-length transactions in that they are sales to insiders who might be in a position to influence price." *Id.* at 1531. Nonetheless, the court noted that it "is irrational to suggest that the lack of arm's length bargaining in this instance worked to the disadvantage of the ESOP." *Id.* Because insider sales are normally suspect in that prices may be artificially low in deference to officers, directors, or key employees, if the sale "had any influence at all, it would only have been to decrease the price which the ESOP paid to [*Capital City*]." *Id.* Since the fair market value of *Capital City's* stock was at least $100 per share, the court concluded, *Capital City* could not be liable for the excise tax. *Id.* at 1532.

In our case it was not unreasonable for the Tax Court to conclude that the sale of stock from Strakis, the minority shareholder, to the directors was not at arm's length. The purchases here involved directors of CTS and a minority shareholder, not the corporation. Eyler, who benefited from the sale in his effort to establish the $14.50 value, provided unsecured bridge loans to six of the seven directors who purchased stock from Strakis. Although the six directors eventually secured bank financing approximately two months after the sale, it is undisputed that Eyler's loans were informal and undocumented.

In light of all the other evidence to show that the stock was worth less than $14.50 a share, the directors' transactions, themselves, were not, in the Tax Court's view, controlling with respect to a determination of fair market value. Eyler contends that the evidence on this issue weighs neither in his favor nor in the Commissioner's. Based on our review of the record, however, the Tax Court did not clearly err in concluding that the transactions between the directors and the minority shareholder, Strakis, were not at arm's length.

For all of these reasons, we are unable to say that the Tax Court committed clear error when it found that Eyler failed to meet his burden of establishing that the fair market value of CTS stock on December 22, 1986, was at least $14.50.

█ We next address Eyler's contention that the ESOP still received adequate consideration when it purchased his stock because CTS's fiduciaries acted in good faith in determining that the fair market value of CTS stock was $14.50 per share. 29 U.S.C. § 1002(18)(B) defines "adequate consideration" as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary [of Labor]." Thus, the burden was on Eyler to show that the fair market value of the stock was determined in good faith by either the trustee or named fiduciaries of the ESOP.

The trustee and plan administrator of the ESOP was John Bruno, the vice president of human resources at CTS. Under the terms of the ESOP, the trustee is not responsible for day-to-day operations of the plan, but rather serves in an administrative capacity, carrying out the discretionary decisions of the plan committee. Bruno played no role in pricing the CTS stock for the ESOP, made no good faith determination of its fair market value, and, therefore, his actions fail to support Eyler's cause.

Similarly, the actions of the members of the plan committee, who were appointed at the December 12, 1986, board meeting, are not helpful. There is no evidence that the committee even met in the ten days between the board meeting and the ESOP purchase. There is also no evidence that any of the committee members conducted any investigation to determine the fair market value of the stock. Thus, as the Tax Court properly found, Eyler is not relieved of excise tax liability on the basis of the committee's alleged good faith determination of fair market value of the stock.

Eyler contends that CTS, acting through its board of directors, qualifies as a fiduciary of the ESOP. There is evidence in the record supporting this argument. First, CTS was expressly designated as a named fiduciary under the terms of the ESOP. CTS was to exercise discretionary authority or control with respect to management of the plan. CTS was the administrator of the plan and was to oversee the plan committee. It also had the power to amend the plan and redesignate members of the plan committee. Having found that CTS acted through its board of directors in establishing the ESOP, we focus on the directors' actions in determining whether CTS exercised good faith in determining fair market value.

█ An ESOP fiduciary is required to act with the care, skill, and diligence that a prudent person would undertake in a like capacity, with the same degree of familiarity with the facts, and with similar aims. 29 U.S.C. § 1104(a)(1)(B). A court must consider "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Katsaros v.*

*Cody,* 744 F.2d 270, 279 (2nd Cir.1984). In reviewing the acts of ESOP fiduciaries under the objective prudent person standard, courts examine both the process used by the fiduciaries to reach their decision as well as an evaluation of the merits. *Donovan v. Cunningham,* 716 F.2d at 1467. ESOP fiduciaries will carry the burden of proving that adequate consideration was paid "by showing that they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing." *Id.* at 1467–68. Thus, the adequate consideration test focuses on the conduct of the fiduciaries in determining the price, not the price itself.

Eyler asserts that in light of the IPO report by Pru–Bache, the briefing of the board by Perry, the opinion letter prepared by CTS's attorneys, and the board's knowledge of earlier takeover valuation opinions, the board acted in good faith in determining the price of the stock. The Tax Court rejected Eyler's contention, finding that the board's actions did not rise to the exacting level of prudence imposed on ERISA fiduciaries. That conclusion, we think, was not clearly erroneous.

At the December 12 meeting, Perry presented the board with information about creating the ESOP and borrowing money so it could purchase CTS shares from Eyler. The board voted to create the ESOP, appointed the trustee, administrator, and members of the plan committee, and guaranteed the bank loan. These actions were taken by the board on behalf of CTS. The testimony of the board members and minutes of the meeting do not indicate that the board was acting as a fiduciary for the ESOP. Significantly, there is no evidence that the board made any independent inquiry regarding the current fair market value of CTS stock in connection with the ESOP transaction. Instead, the board really only had the Pru–Bache letter before it which, as we have noted, was nearly four months old and prepared for an IPO that was subsequently shelved. The continued reliance on this estimate for the ESOP transaction was questionable and not prudent under the circumstances. The board also was aware that the IPO would not be successfully carried out in that price range as demonstrated by the minimal circle of interest. And although the board was aware of the cyclical, changing IPO market, it did not stop to consider whether the dated Pru–Bache valuation had changed by the time the ESOP was introduced and adopted at its December 12 meeting.

In addition, as we noted, the Pru–Bache valuation was based on underlying assumptions that significantly changed by the time of the board meeting. The major assumptions included the absence of an ESOP and its accompanying contributions and loan guarantee, and the influx of millions of dollars of cash as a result of the IPO. At a minimum, the creation of the ESOP itself, with its substantial effects on the financial condition of CTS, should have been given careful and prudent consideration by fiduciaries, such as the board, prior to making the decision that the ESOP would purchase $10 million worth of Eyler's stock. *Donovan v. Cunningham,* 716 F.2d at 1471. The record is devoid of any evidence that the board gave proper consideration to the effect of any of these intervening factors. Although Eyler does mention several items the board supposedly knew when it voted to create the ESOP and guarantee the loan, this does not alter the fact that the board failed to consider several specific factors which had a significant impact on the financial condition of CTS.

To the extent that the CTS board members relied on Perry, they appear to have done so without independently evaluating the merits of his opinion in order to come to their own decisions. The CTS board approved the ESOP plan the same day it was presented to them. With respect to Perry's statements to the board, there is no evidence as to what specific factors he considered in arriving at the $14.50 price, or what questions he answered at the meeting. It is, therefore, impossible to determine whether Perry exercised prudence or whether the other directors understood the basis for the opinion. Although Perry had a favorable reputation as a businessman in the area of public finance and business valuations, the evidence is simply not sufficient to meet Eyler's burden of proving the board members

"employed the appropriate methods to investigate the merits of the investment," *Katsaros v. Cody,* 744 F.2d at 279, or that they exercised their own judgment with regard to the ESOP transaction.

■ Eyler also argues that the CTS board members relied on the opinion of the law firm—which represented CTS both in the proposed IPO and in the ESOP transaction—that the ESOP transaction was not prohibited under ERISA or the Internal Revenue Code. But there is no evidence that the law firm performed a valuation analysis or that the firm purported to possess particular expertise in valuing stock. Moreover, there is no indication that the fiduciaries understood the basis for the opinion. *Reich v. Valley National Bank,* 837 F.Supp. 1259, 1275 (S.D.N.Y.1993). Reliance on counsel's advice, at best, is but a single factor to be weighed in determining whether a fiduciary has breached her duty. *Donovan v. Mazzola,* 716 F.2d 1226, 1234 (9th Cir.1983).

Next, Eyler points to informal opinions of various investment banking firms in 1985 that the value of CTS ranged from $50 million to $120 million as information relied upon by the CTS board. However, the fact that the range of value of CTS was so wide tends to support the view that the board should have been alerted to question the true value of the company. Furthermore, the CTS board knew: (1) the IPO could not be successfully carried out at a $13 to $16 per share range; (2) the IRS might scrutinize reliance on the Pru–Bache estimated price range; (3) CTS was under investigation by the state of California and the federal government; and (4) CTS would have to guarantee a $10 million loan in connection with the ESOP and as a result would be subject to various restrictions, including limitations on its ability to borrow money. Knowledge of all these factors placed upon the fiduciaries a greater duty to investigate.

Finally, time constraints on the board also call into question the actions of its members. Eyler and the underwriters were still trying to market the IPO as late as the first week in November 1986. Eyler wanted to sell a portion of his stock before the end of 1986 in order to take advantage of favorable tax rates for capital gains which were being changed. When the IPO was shelved, the alternative was to form the ESOP, but time was running out to arrange financing and complete the sale of Eyler's stock to the ESOP by the end of 1986. Aware of this time crunch, it is questionable whether the directors had sufficient time to independently evaluate the fair market value of CTS stock before voting to go forward with the ESOP transaction.

In sum, the law requires a fiduciary of an ESOP to act with the care, skill, and diligence that a prudent person would undertake in acting on behalf of ESOP beneficiaries. The degree to which a fiduciary makes an independent inquiry is critical. We find no merit to Eyler's contention that the board of directors was well-informed and, therefore, made a good faith determination of the fair market value of the stock. The record does not show that even one director, let alone a majority, sought independent information on the fair market value of the stock. Rather, on the same day the project was presented, the board voted to guarantee a $10 million loan, the proceeds of which would be used to buy the majority shareholder's stock. A prudent person would not have relied upon the dated Pru–Bache estimated price range for the ESOP stock purchase in light of the failed IPO and changing financial conditions at the corporation. Moreover, there is no evidence that the board was knowledgeable about the effects of these changing conditions on the fair market value of CTS stock. Thus, it was not clear error for the Tax Court to conclude that Eyler did not meet his burden of showing that the directors acted in good faith in determining fair market value.

For the foregoing reasons, the decision of the Tax Court is

A<small>FFIRMED</small>.