In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-1827, 99-1925, 99-1934, and 99-1957

Krueger International, Inc., Mark
R. Olsen, Richard J. Resch, et al.,

Plaintiffs-Appellants, Cross-Appellees,

v.

Julie Blank, et al.,

Defendants-Appellees, Cross-Appellants.


Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 97-C-570--J.P. Stadtmueller, Chief Judge.


Argued January 4, 2000--Decided August 25, 2000



    Before Cudahy, Kanne, and Diane P. Wood, Circuit
Judges.

    Diane P. Wood, Circuit Judge.  Perhaps death and
taxes are the only true certainties, but close
behind must be the risk of dissension when death
occurs and those left behind try to divvy up the
assets. If some of those assets are shares in a
closely held corporation, the problems only get
worse. In this case, different combinations of
the interested parties have been litigating since
the 1992 death of the central figure, Robert
Blank, about the way in which his retirement fund
should be allocated and valued. (We shall refer
to the different Blank family members by their
first names, because Robert's wife Julie Blank
also figures prominently in the case.) The piece
of the dispute that is now before us concerns the
relation between the ERISA plan operated by
Robert's employer, Krueger International, Inc.
(KI), and the stockholder agreement between
Robert and KI that arguably governed the KI
shares invested in the ERISA plan. The answer to
that question in turn tells the parties what they
really want to know, which is how much money KI
must pay to Robert's beneficiaries. If the answer
is determined by the 1992 value of the KI stock,
as KI argues it is and as the district court
held, then the beneficiaries are entitled to
roughly one-fourth of what they would receive if
it is determined by the 1996 or 1997 value of the

stock. As we explain further below, we are in a position to resolve this question in principle in favor of KI's position, but a critical point remains that may yet entitle the beneficiaries to the payment they want. We are therefore reversing and remanding this case for further proceedings before the district court.

I

Robert worked for KI from 1969 until his death in 1992. During his time there, he saved for retirement through KI's Salaried Employees Retirement Plan (SERP). Under the terms of the SERP, plan participants could either invest in the general plan fund (and thus receive the returns that everyone else received) or instead create a "Directed Investment Account," which allowed participants to "monitor and direct the holding and subsequent disposition" of their investments. SERP sec. 4.10(a). Of course, that also meant that the individual participant bore the risk of loss and enjoyed the opportunity for gain in conjunction with her investment decisions. Consequently, the SERP provides that "[a]ny portion of a Participant's Directed Investment Account invested in a specific investment shall be accounted for separately. Income and expenses directly attributable to a Participant's specific investment shall be charged to the account." SERP sec. 4.10(b).

Robert decided to create a Directed Investment Account and thought that he should invest in his own company's stock. Because KI is not a publicly traded company, however, it imposes various restrictions on its shareholders. These are contained in the KI Stockholders Agreement (SA). Robert executed the SA in 1986 and also signed on to a collection of amendments in 1990. Three provisions of the SA and amendments are relevant to our case:

(1)  SA sec. 4.4 provides that upon the death of the employee-shareholder and upon written notice from KI within 90 days of the event, "[KI] shall have the option to redeem all (but not less than all) of the stock of KI."
(2)  Under SA sec. 6.1, when the stock is returned to KI, it is valued at "the proportionate value of the Appraised Value of all shares [of KI stock] as of the last day of the fiscal period . . . ending on or immediately preceding . . . the date of notice of exercise of the option [to repurchase shares from the deceased employee under SA sec. 4.4]."

(3)  The 1990 amendments provide that upon both proper exercise of a repurchase option and a request that shares in the SERP be sold, the

shareholder "shall cause the shares held in [the Directed Investment Account] to be distributed to Stockholder, shall cause the shares to become subject to the Stockholders Agreement, and shall cause the shares to be sold."

When Robert died in 1992, he had accumulated 1,516 shares of KI stock. At the time of his death, this stock was valued at $258.70 per share. One of the beneficiaries of his SERP was his then-wife, Julie Blank. Another portion was held in trust for his children. In addition, Diane Wilson, Robert's former wife, claimed that she was also entitled to a portion of Robert's death benefits as a consequence of their divorce decree. KI was interested in exercising its repurchase option, but it did not want to become mixed up in any family feuds. With those thoughts in mind, on June 10, 1992, KI employee and Plan Administrative Committee member Mark Olsen sent a letter to Julie that read in relevant part:

Krueger International, Inc., does hereby notify you of its intent to redeem all of the shares held by Robert L. Blank through his retirement plan account. . . . We are also aware that Bob's first wife may have a claim against his estate and accordingly we cannot actually disburse any proceeds or issue any notes payable for the redemption of the stock until such time as our legal counsel has assured us that we can distribute the assets [to the stated beneficiary]. Once that issue has been resolved, we will be in contact with you in regard to having the trustee of the Plan surrender the stock certificates to us.

As the dispute over proper beneficiaries was pending, Julie obtained an ex parte order prohibiting KI from distributing any SERP benefits. It took a trip all the way to the Supreme Court of Wisconsin, but finally in 1996 all the family disputes were resolved with an amended domestic relations order determining the percentages of Robert's pension funds that were to go to Julie (31.83%), Diane Wilson (20.43%), and the trust for the benefit of Robert's children (47.74%) (collectively, "the beneficiaries"). At this point, the beneficiaries jointly presented their claim for benefits to KI.

Not surprisingly, the world had continued to turn during the four years while the allocation problems were being resolved. The most important development for present purposes was the good fortune KI had enjoyed: over that period, the value of common shares of KI stock increased nearly fourfold. The difference in the value of the KI shares at the time of Robert's death and the value in 1996 provided the trigger for the

current dispute. In July 1996, Mark Olson, a KI executive and member of the Plan Administrative Committee, met with the beneficiaries and informed them that KI intended to redeem Robert's KI stock at the 1992 price along with interest for the period 1992-1996. Given the current market value, the beneficiaries were none too happy with this result.

KI repeatedly offered only to give the beneficiaries the 1992 price; the beneficiaries repeatedly insisted that they were entitled to current prices. They pointed to another provision of the SERP, sec. 6.09(c), which permits deferral of the receipt of a death benefit. Under that provision, "[d]uring any period of deferral, the portion of the deceased Participant's Account(s) payable as a death benefit to such person shall be entitled to receive allocations of gain or loss in the same manner as other Accounts." According to the beneficiaries, other accounts containing KI stock enjoyed the appreciation from 1992 to 1996, so Robert's stock should appreciate as well. Additionally, the beneficiaries relied on SERP sec. 6.04, which says that the value of a participant's account "shall be based on the most recently available valuation information," which they interpret as requiring KI to use the 1996 or 1997 share price information in calculating the redemption value of Robert's stock. KI read the SERP differently, saying that any asset in the SERP is nevertheless subject to the terms governing that asset. Arguing that it exercised its option to buy back the stock in 1992, KI maintained that Robert's account was different from all others, effectively in limbo until the family disputes were resolved.

Unable to settle its dispute with the beneficiaries, KI sued, seeking a declaration that the appropriate redemption price was $258.70 per share, requesting specific performance of Julie's obligation to order the plan Trustee to tender the shares, and asking for a general declaration of the parties' rights and responsibilities under the SA, SERP, and ERISA generally. Together (at last) with the Estate of Robert Blank, Diane Wilson, and Bank One Trust Company, Julie counterclaimed, asserting that KI had breached its fiduciary duties under ERISA. The district court found that KI had indeed exercised its option under the SA to redeem its shares. However, it also read the SERP as requiring the company to value the stock as of the date of distribution (i.e., 1997). Concluding that the SERP and SA were in conflict, the district court decided that the SA was a collateral contract whose application was preempted by ERISA. It thus granted summary judgment for the beneficiaries on the core

question and held that the 1997 values of the stock had to be used. With respect to the family's counterclaims, however, the court ruled for KI. Additionally, some collateral matters came up during the course of the fight. At one point, Julie requested plan documents from KI. KI was 153 days tardy in delivering the documents, so the judge imposed the maximum statutory sanction--$100 per day or $15,300 in total. Finally, the court denied the beneficiaries' request for attorneys' fees.

Each side appeals, saying that every issue that did not come out its way was wrongly decided.

II
A.

Before turning to the main issue in this case--the interaction between the ownership restrictions and repurchase options contained in the SA and the accounting rules of the SERP--we must dispose of a few collateral questions. One is KI's argument that the Plan Administrative Committee's interpretation of the SERP is entitled to deferential review under Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989). The SERP says that "the Committee shall have the power and duty to . . . determine all questions that shall arise under the Plan." KI believes that this language requires us to defer to its interpretation of the SERP (which of course reconciled its terms with the repurchase option in the SA). Under some of the cases decided when the parties filed their briefs, most notably Patterson v. Caterpillar, Inc., 70 F.3d 503 (7th Cir. 1995), KI might have been right. We subsequently clarified in Herzberger v. Standard Ins. Co., 205 F.3d 327 (7th Cir. 2000), that we will not assume plan discretion simply by virtue of a description of the Plan Administrative Committee's functions. KI's SERP comes fairly close to doing just that--it comes as no surprise that the committee decides questions. We need not decide how the SERP's language would fare under Herzberger, however, since as we explain below, we view the SERP and SA as standing separately.

Secondly, Julie's claim against KI alleging that it breached its fiduciary duties under ERISA rests solely on her argument that KI's attempt to use the 1992 stock price is incorrect. She maintains that by trying to redeem the stock for only $258.70 per share, KI is trying to cheat her and the other beneficiaries out of what is rightfully theirs under the terms of the SERP. But this means that the real dispute exactly parallels KI's claim, which seeks a declaration that the 1992 share price is the appropriate one. Julie wants attorneys' fees as part of the

damages for the breach of fiduciary duty, but her sole basis for that request is 29 U.S.C. sec. 1132(g), which allows the district court to award fees "[i]n any action" under ERISA that is brought by a fiduciary or beneficiary. So the counterclaim is a perfect mirror of KI's claim and adds nothing of substance to the case.

Related to this point is a consideration that relates to the jurisdiction of the district court. Ordinarily, of course, a dispute between a corporation and some of its stockholders about the terms of the shareholders' agreement would not fall within federal jurisdiction. Corporate law is, for the most part, state law, and no one is claiming diversity as a basis for jurisdiction here. But KI has argued that the shareholder agreement, at least for purposes of this case, is a contract that relates to an ERISA plan and thus must be interpreted and enforced under federal common law. See Dranchak v. Akzo Nobel, Inc., 88 F.3d 457, 459-60 (7th Cir. 1996). That point gets KI nowhere, however, because ERISA preemption is just a defense, and it is well-established that anticipating a federal defense does not create federal jurisdiction. See Blackburn v. Sundstrand Corp., 115 F.3d 493, 495 (7th Cir. 1997). One might also argue that because the SA governs the terms of the stock ownership whether the stock is owned by an individual, a company, or an ERISA plan, the SA's relation to the plan is "too tenuous, remote, or peripheral" to be considered "relate[d] to" the SERP. See Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 100 n.21 (1983). The substance of this case makes it clear, however, that federal jurisdiction is secure. The SA specifically mentions pension plans and is thus consciously related to the plan here. Furthermore, as soon as the counterclaim was filed raising precisely the same points, jurisdiction existed to decide the counterclaim and the original claim would have fallen under the court's supplemental jurisdiction. It was a simple case in which a beneficiary of a plan demanded benefits in a certain amount, and the employer contested that claim.

The third collateral issue concerns the district court's decisions to award Julie statutory penalties for KI's delay in responding to her document request but deny her recovery of attorneys' fees. Both of these issues are committed to the district court's discretion. See 29 U.S.C. sec. 1132(c)(1) (sanctions for delay); sec. 1132(g)(1) (fees). Neither side contests that KI was 153 days late in responding to Julie's request for SERP documents, but KI says that the decision to impose the statutory maximum--$100 per day or $15,300 in total--was an abuse of discretion. We see no abuse, especially as KI failed to provide any explanation for the

delay. KI also says that we should remand the statutory penalty question to the district court so that it can clarify its reason for changing the award from $1,530 to $15,300. That is not necessary, because the reason is clear enough from the record: the district court made a simple arithmetic error that it subsequently corrected. Likewise, we see no abuse in the district court's decision to deny fees. As we ask whether the losing party's position was "substantially justified and taken in good faith," Quinn v. Blue Cross and Blue Shield Ass'n, 161 F.3d 472, 478 (7th Cir. 1998) (citations omitted), and as we see substantial merit in both sides' arguments, there was certainly no abuse of discretion in the denial of fees.

Lastly, KI argues that if it is required to value the stock at 1996 or 1997 levels, we allow it to distribute it in kind to the beneficiaries (as opposed to distributing the appropriate amount of cash). This is a somewhat peculiar position, as the ownership restrictions in the SA were seemingly designed to preclude outside ownership. (It makes us wonder what has happened to the value of the stock while this round of litigation has been pending, but that is obviously not in the record and not material to our decision.) In any case, KI did not raise this possibility until its Rule 59(e) motion, so it has waived any argument that it is entitled to distribute stock rather than cash. Moro v. Shell Oil Co., 91 F.3d 872, 876 (7th Cir. 1996). If KI believed that it was allowed to distribute stock rather than cash to the beneficiaries if it lost in the district court, it had ample opportunity to present this alternative argument prior to the entry of judgment.

B.

With the underbrush cleared away, we turn to the task of reconciling the apparent contradiction between the SERP and the SA. The beneficiaries rely principally on 29 U.S.C. sec. 1144(a), which provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." See also Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 64-65 (1987); Dranchak, 88 F.3d at 459-60. They contend that KI's action to enforce the repurchase option in the SA is a state law contract action that is preempted by ERISA, meaning that the terms of the SERP must govern if they are in conflict. Also implicit in their argument is the idea that the SA cannot be a proper amendment to the SERP because it was not adopted pursuant to the proper amending procedures. See 29 U.S.C. sec. 1102(b)(3); Downs v. World Color Press, 214 F.3d

802, 805 (7th Cir. 2000).

The beneficiaries' position is straightforward. They rely on the sections of the SERP that provide for valuation using the most recent information (sec. 6.04) and accrual of gains and losses at the same rate as other accounts when distribution is deferred after the principal beneficiary dies (sec. 6.09). They argue that because the stock remained in Robert's account, it must accrue gains and losses at a rate equal to other accounts containing similar amounts of KI stock. So, since KI stock generally increased in value fourfold, so too Robert's stock must have increased. KI counters by noting that SERP sec. 4.10(b) makes clear that "[a]ny portion of a Participant's Directed Investment Account invested in a specific investment shall be accounted for separately." KI therefore believes that where a participant-controlled directed account is concerned, the accounting provisions on which the beneficiaries rely mean nothing more than that Robert was entitled to whatever returns the particular assets in his account would bring. Moreover, on the assumption (which the district court accepted) that KI had effectively exercised its repurchase option in 1992, KI claims that the value of Robert's KI stock was fixed at $258.70 (plus interest, which is not contested here) from the time the option was exercised.

We agree with the essential point that KI makes, but not with all of its factual assumptions. Before the accounting rules of an ERISA plan can be applied, the basic terms of the asset to be accounted for must be determined. That is what the SA does--it defines the bundle of rights to which a KI shareholder (whether a direct shareholder or a shareholder through an ERISA plan) is entitled. Because KI has chosen to remain a privately held company, it has the prerogative to limit ownership in its shares to employees. It has chosen to do so, which makes it necessary to include a repurchase option in its shareholder agreement (so that when employees leave the firm, it gets the shares back). Accepting this repurchase option is an inseparable part of owning KI stock, which means that Robert and his successors in interest to the stock are bound to its terms. Contrary to the beneficiaries' contentions, the fact that they themselves were not signatories to the SA is irrelevant. They cannot add to the value of the KI stock by eliminating the repurchase option solely by surviving Robert. Similarly, it makes no difference that some shares held in the plan may not have been formally subject to the SA. Robert agreed as part of the 1990 amendments to order the plan to distribute his shares, then sell the shares back to KI. The net effect of

these provisions is identical to the repurchase option in the SA.

Neither the SERP nor ERISA in any way undercut this view of the SA. The SERP governs the relation between the plan and the beneficiary and dictates the way that plan assets (whether in an ordinary or in a directed account) are to be handled. But that does not mean that the SERP modifies the terms of the assets themselves. A simple example illustrates the point. Suppose that rather than investing in his own company's stock, Robert had instead invested in a third-party limited partnership that imposed ownership restrictions similar to those found in the SA. Upon Robert's death, the limited partnership would have the right to repurchase Robert's interest. If it exercised that option but there was a delay in distribution, nobody would seriously contend that KI's SERP overrode the partnership agreement. That agreement would govern the nature of the property that the SERP held. The principle that ERISA preempts state law applies where ERISA and the state law conflict regarding the distribution of an already defined sum. That point is what distinguishes our case from Boggs v. Boggs, 520 U.S. 833 (1997), on which the beneficiaries rely heavily. Boggs concerned a Louisiana law that would have redirected a stream of annuity payments that ERISA designates as belonging to the surviving spouse. The Court held that ERISA's objective (ensuring the economic security of the surviving spouse) preempted the state law alternative distribution scheme. But the law at issue in Boggs did not define the asset to be distributed, as the SA does here. In short, the SA is a contract between Robert and KI acting in its capacity as a corporate issuer of stock; the SERP is a contract between Robert and KI as plan administrator. And it is those two different KI capacities that allow us to reconcile the SA and the SERP. They simply perform two different functions.

Next, the beneficiaries contend that a redemption of the KI stock in Robert's account for $258.70 is prohibited by ERISA itself, which requires that all exchanges between a plan and a beneficiary be for "adequate consideration." 29 U.S.C. sec. 1108(e)(1). Consideration is adequate if it equals "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan." 29 U.S.C. sec. 1002(18). The beneficiaries also point to a proposed ERISA regulation that would require that the adequacy of the consideration "be determined as of the date of the transaction," 53 Fed. Reg. 17632, 17634 (May 17, 1988), and SERP sec. 6.04, which requires the

plan to use its most recent valuation information. According to the beneficiaries, these terms render KI's proposed redemption price a prohibited transaction--it is trying to exchange stock that is worth roughly $1000 for a paltry $258.70. KI counters by arguing that because of the repurchase option in the SA, the beneficiaries are in fact getting fair market value for the particular KI stock held in Robert's directed account. Essentially, the parties are talking about apples and oranges here. Stock unencumbered by a repurchase option--which became a call at the time of Robert's death, pursuant to sec. 4.4 of the SA--is not the same thing as stock that is so encumbered. If, as the district court found, KI exercised its option when the share price was $258.70, then at that moment Robert's stock became quite different from ordinary KI stock. From that time it would have been stock subject to an exercised call option. Because the fair market value of stock that someone else has the right to purchase for $258.70 is just $258.70 (at least as long as the stock alone is worth more than that), there would be no violation of the ERISA "adequate consideration" rules for KI to pay that amount per share (plus the interest, of course) to the beneficiaries. All of this is to say simply that the beneficiaries are entitled only to what the plan provides; there can be no breach of fiduciary duty if that is what the plan gives them.

We come, then, to the central question: how do the SERP and SA relate to one another and ERISA? If the beneficiaries are right and the SERP trumps the SA's repurchase option, then of course KI cannot buy the stock back at the 1992 price. On the other hand, if KI is right and under the governing agreements it had a valid option that it exercised when the share price was $258.70, then its offer to give the beneficiaries that amount plus interest would satisfy ERISA's requirement that consideration be based on fair market value. In other words, the timing of the transaction is secondary to the validity of the repurchase option. If there was a valid repurchase option, and if KI exercised it, then the value of Robert's stock was unchanged after the option was exercised. Consequently, SERP sec. 6.04 makes no difference because 1997 price information does not affect stock subject to a call option that was exercised in 1992. The beneficiaries rely on Eyler v. Commissioner of Internal Revenue, 88 F.3d 445 (7th Cir. 1996), but that case concerned an attempt by a taxpayer to use out-of-date appraisals for stock whose value floated with the market in order to minimize liability. Obviously, if KI was supposed to figure out the value of its stock in 1997,

1992 is a lousy place to start. But the point is that an exercise of KI's repurchase option would have frozen the stock value in 1992. In essence, although Robert (or his estate) would still have been the owner of record, KI would have assumed the risk of loss and opportunity for gain. Robert and his beneficiaries would have been left with a guarantee of a fixed amount of cash (a fine thing in a declining market; much less attractive in boom times). In our view, the language of the SA plainly creates the kind of option we are discussing: to repeat, it says that upon the death of the employee-shareholder and upon written notice from KI, KI "shall have the option to redeem all (but not less than all) of the stock of KI."

C.

The only remaining issue is whether KI actually exercised its option to repurchase Robert's shares at the $258.70 price. While the option is valid for the reasons we have discussed, that does not mean that it is mandatory. KI could very well have decided to let the beneficiaries keep the stock. Only if it exercised the option when the price was $258.70 is it entitled to judgment. Although this point was occasionally subsumed in their discussions of the intricacies of ERISA, the parties hotly disputed the issue in their submissions to the district court and again at oral argument here. The district court indicated that it found that KI had in fact exercised its option, but it did not discuss its reasoning. If this was intended as a formal finding of fact, we find it unsupported by the record thus far; if it was a comment in passing, we conclude that the issue is so central that it must be considered and the conclusion must be explained.

As things stand, whether the option was exercised is anything but clear. The June 10, 1992 letter talks about an intent to exercise the option, but concludes by saying that the company will take action at some later time. The contract is silent with respect to what is required for the exercise of the option. The beneficiaries maintain that notice by registered mail is required, but the SA says only that such notice is per se sufficient, not that it is mandatory. (Maybe registered mail is meant to be the exclusive means of notice, but the SA does not on its face compel this conclusion.) The beneficiaries also say that KI did not exercise the option because if it had, it would have closed the transaction within 90 days. That, too, may be helpful evidence, but it is not decisive. KI counters by saying that it was Julie's breach of her contractual obligations (as the representative of Robert's estate) to "cause the

shares to be sold" that led to the substantial delay.

Under the circumstances, we regretfully conclude that nothing but a remand will do. Since the SA is silent regarding what specific steps are required for KI to exercise its repurchase option under sec. 4.4, perhaps the parties will try to use extrinsic evidence to clarify how and when an option is exercised. See, e.g., Rosetto v. Pabst Brewing Co., 2000 WL 862847 (7th Cir., June 29, 2000). Also, the parties' conduct or prior understanding might yield some insight into whether KI's actions sufficed to exercise its option. KI did send the required notice of intent to redeem, but then sat on its hands for several years. It believed that the Wisconsin court's ex parte order barred it from completing the sale. That position is odd, however, as both the court order and Olson's letter indicate only that the proceeds of Robert's account could not be distributed. We cannot see any reason why the stock could not have been redeemed and the cash placed in escrow while the beneficiaries figured out their respective shares. Indeed, even the beneficiaries' counsel conceded at oral argument that this would have been quite a different case if KI had done that. (Indeed, maybe this case would never have materialized at all, and everyone would have gone about his or her business from 1996 forward.) On the facts as they appear in the record, it is unclear whether KI actually exercised its option under the SA to repurchase Robert's shares after his death. If the court finds on remand that it did exercise its option, then KI may finally end this litigation by tendering the $258.70 per share, plus interest, to the beneficiaries according to the formula the Wisconsin courts have established. If it did not, then its failure to do so within the 90 days provided by the SA means that it may now redeem the stock only by paying the value of the stock as of the time when it definitively informed the beneficiaries that it wished to redeem.

III

For the foregoing reasons, the judgment of the district court is Reversed and the case Remanded for further proceedings consistent with this opinion. Each party shall bear its own costs on appeal.